## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| **THOMAS HORTON AND FRANK MOORE,** on behalf of themselves and all others similarly situated, | § § § § | |
| Plaintiffs, | § § | **CIVIL ACTION NO.: 3:23-CV-01230** |
| v. | § § § | **JURY TRIAL DEMANDED** |
| **BRAD K. HEPPNER, PETER T. CANGANY, JR., THOMAS O. HICKS, DENNIS P. LOCKHART, BRUCE W. SCHNITZER, THE BENEFICIENT COMPANY GROUP, L.P. AND WHITLEY PENN LLP,** | § § § § § § § § § | |
| Defendants. | § | |

## CLASS ACTION COMPLAINT FOR VIOLATION OF
## THE FEDERAL SECURITIES LAWS

## TABLE OF CONTENTS

I.      SUMMARY OF THE ACTION ............................................................................. 1

II.     JURISDICTION AND VENUE ........................................................................... 8

III.    PARTIES ............................................................................................................ 8

        A.      Plaintiffs ................................................................................................ 8

        B.      Defendants ............................................................................................ 8

IV.     FACTS ................................................................................................................ 9

        A.      GWG and the L Bonds.......................................................................... 9

        B.      GWG Pivots from Investing in Life Insurance Policies to Investing in Ben ........ 11

        C.      Control of GWG Shifts to Ben............................................................. 14

        D.      False and Misleading Statements in the Registration Statement ......................... 15

                1.      The Registration Statement's False and Misleading Representations
                        Concerning Ben's Business and Operations ............................................... 16

                2.      The Registration Statement's False and Misleading Representations
                        Concerning Ben's Financial Performance and Assets ............................. 21

                3.      The Registration Statement's False and Misleading Representations
                        Concerning Ben's Goodwill ................................................................ 25

                4.      The Registration Statement's False and Misleading Representations
                        Concerning GWG's Internal Control Over Financial Reporting............. 27

                5.      The Registration Statement's False and Misleading Representations
                        Concerning Related Party Transactions in the Form of Repayment
                        of Certain Ben Indebtedness ................................................................ 30

                6.      The Registration Statement's False and Misleading Representations
                        Concerning Resignations of Certain Directors in October 2019 ............. 33

        E.      The Registration Statement's False and Misleading Representations Concerning
                GWG's Business and Finances Were Material to Investors ................................. 36

                1.      GWG Misses Its 2020 10-K Filing Deadline and Suspends the
                        Offering ........................................................................................... 37

                2.      GWG Restates Its Financials ............................................................... 38

       3.     GWG Discloses It Is Under Investigation by the SEC ............................. 38

       4.     Ben Spins Off from GWG, and GWG Issues a "Going Concern" Warning and Invokes Bankruptcy Protection ............................................. 39

V.     THESE INVESTOR CLAIMS ARE TIMELY .................................................. 39

VI.    CLASS ALLEGATIONS ................................................................................. 40

COUNT I Violation of § 11 of the Securities Act Against the Individual Defendants ................ 43

COUNT II Violation of § 11 of the Securities Act Against Whitley Penn.................................... 45

COUNT III Violation of § 12(a)(2) of the Securities Act Against the Individual Defendants .... 46

COUNT IV Violation of § 15 of the Securities Act Against Ben and the Individual Defendants 48

PRAYER FOR RELIEF ............................................................................................. 49

Plaintiffs Thomas Horton and Frank Moore ("Plaintiffs"), by and through their undersigned counsel, allege the following based upon the investigation of counsel, which included, among other things, the review and analysis of: (i) public filings of GWG Holdings, Inc. ("GWG" or the "Company") with the U.S. Securities and Exchange Commission ("SEC") and public filings in the bankruptcy proceeding *In re GWG Holdings, Inc., et al.*, Case No. 22-90032 (MI) (Bankr. S.D. Tex.), including the Official Committee of Bondholders' Proposed Adversary Complaint ("OBC Complaint"); (ii) press releases and other public statements of GWG and Defendants; and (iii) media and news reports and other publicly available information concerning GWG and Defendants. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.      SUMMARY OF THE ACTION

1.      Plaintiffs acquired "L Bonds" issued by GWG pursuant to a June 2020 registration statement. They seek relief under sections 11, 12, and 15 of the Securities Act of 1933. Defendants are the Directors who signed the registration statement, GWG's independent auditor, and a company affiliated with GWG known as Ben, sued as a controlling person.

2.      From its inception in 2006 through 2018, GWG's business centered on purchasing life insurance policies on the secondary market at a discount to the death benefit. GWG funded its general operations and the purchase of life insurance policies through the sale of L Bonds ("L" as in life insurance). In 2018 GWG announced it would transition its focus from life insurance investments to investing in The Beneficient Company Group, L.P. ("Ben"), a limited partnership founded and controlled by Defendant Brad Heppner. Ben aimed to provide "liquidity solutions" to wealthy individuals and entities holding illiquid assets.[1]

---

[1] GWG Holdings, Inc., Annual Report at p. 2 (Form 10-K) (Mar. 27, 2020).

3.     Concurrently with GWG's shift in business focus, through a complex series of transactions, in April 2019, Heppner and his associates acquired control of GWG from its founding shareholders. Over the next several years GWG made cash investments in Ben totaling approximately $289 million.

4.     By the end of 2019 GWG faced negative cash flow and its debt exceeded the fair value of its life insurance portfolio. GWG was dependent on continuous sales of new L Bonds to repay principal and interest owed to earlier L Bond investors. GWG's future—and the fortunes of the L Bond investors—turned on Ben's successful implementation of its business model.

5.     As part of GWG's ongoing L Bond fundraising, in June 2020, GWG commenced a new offering of L Bonds (the "Offering"), pursuant to a registration statement and prospectus declared effective June 3, 2020. Those offering materials expressly incorporated GWG's 2019 annual report, GWG's first quarter 2020 report, and other GWG reports filed with the SEC.

6.     In the Registration Statement,[2] GWG said Ben's new business model was "transforming the alternative asset industry with disruptive and innovative products."[3] GWG said Ben's liquidity "products and solutions" were "structured *as loans from [Ben's] subsidiary to unaffiliated* trusts that acquire ownership interests in the alternative assets," with the cash flows from the alternative assets collateralizing the loans.[4]

---

[2] The registration statement was filed March 30, 2020, amended May 15, 2020, and declared effective June 3, 2020. The registration statement included a prospectus dated June 3, 2020, filed June 5, 2020, and supplemented August 17, 2020, and November 23, 2020 (as amended, the "Prospectus"). The registration statement incorporates by reference GWG's Annual Report on Form 10-K for the year ended December 31, 2019, filed with the SEC March 27, 2020 ("2019 10-K"); GWG's Quarterly Report on Form 10-Q for the quarter ended March 31, 2020, filed with the SEC May 15, 2020 ("March 2020 10-Q"); and GWG's Current Reports on Form 8-K filed with the SEC January 7, 2020, February 27, 2020, March 6, 2020, March 18, 2020, and March 20, 2020. The registration statement as amended, the Prospectus, and the materials incorporated therein are referred to as the "Registration Statement." "Offering Period" refers to the period between the effective date of the Offering and April 16, 2021, when GWG suspended the Offering.

[3] GWG Holdings, Inc., Annual Report at p. 1 (Form 10-K) (Mar. 27, 2020).

[4] *Id.* at pp. 33-34 (emphasis added).

2

7.      GWG raised over $350 million in new L Bond sales, and reissued or renewed L Bonds originally issued under previous registration statements, pursuant to the 2020 Registration Statement. But after missing the deadline to file its 2020 annual report, GWG suspended the Offering in April 2021. GWG also missed the deadline to file quarterly reports for the first three quarters of 2021. GWG did not file the delinquent reports until November 2021.

8.      The Restatement. In its 2020 annual report, eventually filed November 5, 2021, GWG restated its financial statements for the year ending December 31, 2019, and for the interim periods ending March 31, 2020, June 30, 2020, and September 30, 2020 (the "Restatement"). The Restatement affected, for each restatement period, (1) the consolidated balance sheet; (2) the consolidated statement of operations; (3) the consolidated statement of changes in stockholders' equity; and (4) the consolidated statement of cash flows. GWG admitted in the Restatement that the financial statements within the Registration Statement were inaccurate and unreliable, that GWG lacked adequate internal and financial controls, and that a material weakness existed in GWG's internal control over financial reporting.[5]

9.      GWG's accounting and reporting errors primarily related to Ben and its subsidiaries, whose financial results GWG began reporting on a consolidated basis on December 31, 2019. In the Restatement, GWG acknowledged its failure to properly account for certain trusts, referred to as the "ExAlt Trusts," which Ben had created after entering the alternative asset business. These trusts, which the Registration Statement described as "unaffiliated trusts," were actually Ben subsidiaries; they were the same entities to which Ben purportedly made loans and provided services and from which Ben purportedly received interest and fees. Because accounting principles require treating payments of interest from Ben subsidiaries to Ben as *intra*-company

---

[5] GWG Holdings, Inc., Annual Report at pp. F-70 – F-74 (Form 10-K) (Nov. 5, 2021).

transfers, the Restatement eliminated all of the interest income that GWG had reported for Ben for the period ending March 31, 2020, and subsequent reporting periods. Further, since all of Ben's fees receivable and financing receivables were due from its own subsidiaries rather than from *bona fide* third parties, the Restatement also eliminated these assets for the year ending December 31, 2019, the period ending March 31, 2020, and subsequent reporting periods.

10.     Qualitatively as well as quantitatively, the Registration Statement misrepresented Ben's business. Rather than lending and providing services to third parties, Ben, through its subsidiaries, had invested in risky alternative assets. Ben's primary tangible assets were those investments—not loans receivable. In representing that Ben was generating revenue through lending, the Registration Statement indicated that Ben had begun implementing a successful lending-based business model, and that its business prospects were materially more favorable than justified by its actual financial performance. In reality, although undisclosed by the Registration Statement, Ben's investments in the alternative assets were unsecured and had declined in value.

11.     The Registration Statement also contained material misstatements and omissions in several other areas, including GWG's financial reporting of goodwill attributable to Ben; the use of L Bond proceeds that GWG invested in Ben to personally enrich Heppner; and the resignations of several Directors.

12.     <u>Ben's financial performance and goodwill</u>. As to basic accounting, the Restatement makes clear that the Registration Statement inaccurately stated Ben's revenue and assets. These acknowledged errors were material. For the period ending March 31, 2020, the Restatement eliminated previously-stated interest income of about $13 million and trust services fee income of about $5 million. Among other corrections to GWG's balance sheets, the Restatement eliminated previously-stated fees receivable of approximately $29 million and $30 million as of December

31, 2019 and March 31, 2020, respectively. The Restatement's corrections to GWG's balance sheet served to increase its deficit by approximately $21 million and $19 million as of December 31, 2019 and March 31, 2020, respectively.

13.     While not addressed by the Restatement, the goodwill valuations attributable to Ben that GWG reported—approximately $1.5 billion as of December 31, 2018 and $2.4 billion as of December 31, 2019—were unsupported and materially inflated, portraying Ben as having far more value than it actually had.

14.     <u>Lack of effective internal control over financial reporting</u>. The Registration Statement referenced "the effectiveness of GWG Holdings, Inc.'s internal control over financial reporting" and included an unqualified opinion from the accounting firm Whitley Penn that GWG "maintained, in all material respects, effective internal control over financial reporting" at the Company. In the Restatement, however, GWG admitted just the opposite: "a material weakness existed in our internal control over financial reporting for all periods from December 31, 2019 to December 31, 2020. As of December 31, 2020, the design and operating effectiveness of controls over the selection, application and review of the implementation of accounting policies were *not* sufficient to ensure amounts recorded and disclosed were fairly stated in accordance with GAAP." (Emphasis added).

15.     <u>Use of proceeds</u>. The Registration Statement failed to disclose that Heppner had an interest in certain GWG and Ben transactions, and that the transactions therefore qualified as related party transactions. On December 31, 2019, GWG used L Bond proceeds to make a $79 million investment in Ben. On that same day, Ben used a portion of those funds to pay down $49.8 million in Ben debt. The Registration Statement failed to disclose that a substantial portion of the debt was attributable to the purchase of a ranch owned by Heppner, valued in 2017 at $57 million,

and to other expenditures unrelated to Ben's then-current operations. Heppner had an interest in these transactions, personally benefitting from Ben's use of funds invested by GWG to retire debt associated with his personal property. The Registration Statement also failed to disclose that a portion of the funds that Ben paid to its lender was subsequently transferred to entities affiliated with Heppner, making Heppner an interested party both as to GWG's cash investment in Ben and as to Ben's payment to its lender using a portion of those funds.

16.     GWG acknowledged in its belated 2020 annual report that funds paid to Ben's lender were subsequently transferred to Heppner's affiliates. GWG also acknowledged that GWG's cash investment in Ben, and Ben's use of a portion of those funds to make a payment to its lender, required disclosure as related party transactions. GWG has never acknowledged that debt on Ben's balance sheet was incurred for the purchase of Heppner's ranch.

17.     That Ben was responsible for debt incurred to purchase a ranch owned by Heppner, that proceeds from L Bonds sales had been used to retire debt associated with the ranch, and that L Bond proceeds were transferred to Heppner's affiliates, were material facts. These facts would have been important to an ordinary investor assessing GWG's strategy of investing in Ben, the independence and competence of GWG's Board, the candor of its management, and the motivations of Heppner and related parties.

18.     Director resignations. In late 2019 several GWG Board members resigned after voicing concerns to Heppner and others in management concerning GWG's investments in Ben, Ben's transfers of cash to related parties, and Ben's cash flows, capitalization, and business plans. These Directors resigned when GWG failed to provide satisfactory answers to their requests for information. Instead of disclosing that the Board members had resigned over concerns regarding GWG's business plan and use of L Bond proceeds, the Registration Statement falsely stated that

the Company reduced the size of the Board from 14 to 10 Directors to "facilitate the Board of Directors' ability to oversee the Company's operations in an efficient and effective manner."[6] Those false statements prevented investors from learning that former Directors had resigned out of concern with GWG's strategy of investing in Ben.

19.    <u>Whitley Penn LLP</u>. Acting as GWG's independent auditor for the calendar year ended December 31, 2019, Whitley Penn provided an unqualified audit opinion on GWG's 2019 financial statements incorporated by reference into the Registration Statement.[7] Two years earlier, Whitley Penn had also provided an unqualified audit opinion on Ben's 2017 financial statements, accepting Ben's accounting treatment of its purported borrowers as "unaffiliated trusts." Ben retained a new auditor for its 2018 fiscal year. The new auditor determined that Ben's 2017 financial statements required restatement on account of Ben's failure to consolidate those trusts. Nevertheless, GWG—which by then was under common control with Ben—hired Whitley Penn to audit its 2019 financial statements. Whitley Penn repeated the same error it had made as Ben's auditor, this time providing an unqualified opinion that GWG's financial statements were fairly presented in accordance with U.S. Generally Accepted Accounting Principles ("GAAP") despite Ben's failure, once again, to consolidate the trusts as required under GAAP.

20.    Concurrently with the Restatement, GWG announced an SEC investigation— which remains ongoing—and issued a "going concern" warning.[8] The disclosure of the Restatement and the SEC investigation prevented GWG from resuming the Offering. Without new L Bond sales to repay amounts owed on the earlier issued L Bonds, GWG was destined for bankruptcy. On February 14, 2022, GWG announced the suspension of payments of interest and

---

[6] GWG Holdings, Inc., Prospectus at p. 2 (Form 424B1) (June 5, 2020).

[7] GWG Holdings, Inc., Annual Report at pp. F-1 – F-2 (Form 10-K) (Mar. 27, 2020).

[8] GWG Holdings, Inc., Annual Report at p. 12 (Form 10-K) (Nov. 5, 2021).

principal on its L Bonds. On November 29, 2021, GWG consummated a spinoff of Ben. On April 20, 2022, GWG declared chapter 11 bankruptcy.

## II.   JURISDICTION AND VENUE

21.     The claims asserted herein arise under and pursuant to §§ 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2) and 77o. This Court has jurisdiction over this action pursuant to § 22 of the Securities Act, 15 U.S.C. § 77v, and 28 U.S.C. § 1331.

22.     Venue is properly laid in this District pursuant to § 22 of the Securities Act and 28 U.S.C. §§ 1391(b) and (c). The acts and conduct complained of herein occurred in substantial part in this District as GWG maintains its principal place of business in this District.

23.     In connection with the wrongful acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and facilities of the national securities markets.

## III.   PARTIES

### A.     Plaintiffs

24.     Plaintiff Thomas Horton resides in Utah. He acquired $5,600,000 of L Bonds pursuant to the Registration Statement on or about July 22, 2020.

25.     Plaintiff Frank Moore resides in California. He acquired $225,000 of L Bonds pursuant to the Registration Statement on or about September 1, 2020, and acquired $58,000 of L Bonds pursuant to the Registration Statement on or about January 1, 2021.

### B.     Defendants

26.     Defendant Brad K. Heppner resides in Texas. Heppner was the Chairman of GWG's Board of Directors from April 26, 2019 to June 14, 2021. Heppner is the founder of Defendant Ben, the Chairman of Ben's Board of Directors, and its Chief Executive Officer.

27.     Defendant Peter T. Cangany, Jr. resides in Washington. Mr. Cangany was a Director of GWG from April 26, 2019 until his resignation on June 20, 2022. Mr. Cangany is a Director of Ben.

28.     Defendant Thomas O. Hicks resides in Texas. Mr. Hicks was a Director of GWG from April 26, 2019 until his resignation on June 14, 2021. Mr. Hicks is a Director of Ben.

29.     Defendant Dennis P. Lockhart resides in Georgia. Mr. Lockhart was a Director of GWG from May 13, 2019 until his resignation on June 14, 2021. Mr. Lockhart is a Director of Ben.

30.     Defendant Bruce W. Schnitzer resides in Connecticut. Mr. Schnitzer was a Director of GWG from April 26, 2019 until his resignation on June 14, 2021. Mr. Schnitzer is a Director of Ben.

31.     The individual Defendants described above are collectively referred to herein as the "Individual Defendants."

32.     Defendant The Beneficient Company Group, L.P. is a Delaware limited partnership formed on or about September 16, 2003, and headquartered in Dallas, Texas.

33.     Defendant Whitley Penn LLP is a Texas limited liability partnership formed on or about February 17, 2006, and headquartered in Fort Worth, Texas.

IV.     **FACTS**

A.     **GWG and the L Bonds**

34.     From its founding in 2007 until January 2018, GWG's business centered on buying life insurance policies on secondary markets. GWG raised the money needed to buy the policies through the sale of L Bonds. GWG proposed to earn a profit, after payment of operating expenses, principal, and interest on the bonds, by allegedly purchasing the policies at a discount in relation to the expected mortality benefit payable upon the death of the insured.

35.     The L Bonds were not offered by any of the major securities brokerage firms such as JPMorgan Chase, Wells Fargo, Bank of America, or UBS. The L Bonds were instead sold by a network of independent broker-dealers. The L Bonds were almost exclusively sold to individual retail investors, many of them retirees, rather than to institutional investors and mutual funds. The bonds were never listed on any exchange.

36.     The life insurance policies that GWG purchased did not produce the income needed for those purchases to be profitable. Insureds were living longer than GWG had forecast they would: GWG had miscalculated the cost at which it needed to acquire policies for them to deliver positive cash flow for the Company.

37.     GWG relied on L Bond purchases to fund its operations. But the costs to GWG of issuing, selling, and servicing the L Bonds were considerable. In addition to paying selling commissions to the brokers of L Bonds at rates of 0.75% to 7%, depending on maturity date, GWG was responsible for payments of interest and principal, and other charges, on its L Bond debt.

38.     For its business to be successful—and for L Bond holders to recover their principal and interest—GWG's life insurance investments needed to outpace the ever-increasing costs associated with its continuous issuance of L Bonds. Instead, as of the end of 2018, the fair market value of GWG's life insurance portfolio was approximately $400 million less than its total debt obligations, and GWG faced increasingly negative cash flows.[9] The more L Bonds GWG sold, the greater the proportion of L Bond proceeds it needed to make interest, principal, and servicing payments on its accumulated L Bond debt. GWG's only hope of returning to profitability and repaying L Bond investors turned on its ability to identify and implement a profitable new

---

[9] GWG Holdings, Inc., Annual Report at pp. F-4, F-6 (Form 10-K) (Mar. 27, 2020).

investment strategy for the deployment of the net proceeds of its L Bond sales, after repaying earlier investors and covering overhead.

**B.      GWG Pivots from Investing in Life Insurance Policies to Investing in Ben**

39.      On January 18, 2018, GWG announced in an 8-K filed with the SEC that it had entered into a strategic relationship with Ben, which GWG described as "the first financial services platform designed to provide a comprehensive suite of innovative lending and liquidity products offered to meet the rapidly growing liquidity demand from the nearly one million underserved mid-to-high net worth (MHNW) individual investors and small-to-medium institutional owners of alternative assets."[10]

40.      After announcing its new strategic relationship with Ben, GWG continued raising money by selling L Bonds, but shifted from investing in life insurance policies to making passive investments in Ben.

41.      Ben's purported business plan was to provide liquidity to holders of private equity interests and other similar illiquid assets. According to the Registration Statement, Ben planned to operate three "potentially high value, high margin lines of business":

- Private Trust Lending & Liquidity Products. Through Beneficient Capital Company, L.L.C. ("BCC"), Beneficient provides a unique suite of private trust, lending and liquidity products focused on bringing liquidity to owners of professionally managed alternative assets. Beneficient's innovative liquidity solutions are designed to serve mid-to-high net worth ("MHNW") individuals, small-to-mid sized ("STM") institutions, and asset managers who have historically possessed few attractive options to access early liquidity from their alternative assets. Beneficient targets MHNW clients with $5 million to $30 million in net worth and STM institutional clients typically holding less than $1 billion in assets.

- Trust and Custody Services. Through Beneficient Administrative and Clearing Company, L.L.C. ("BACC"), and (subject to capitalization) through Pen Indemnity Insurance Company, LTD ("Pen"), Beneficient

---

[10] GWG Holdings, Inc., Current Report, Ex. 99.1 at p. 1 (Form 8-K) (Jan. 18, 2018).

plans, in the future, to market retirement funds, custody and clearing of alternative assets, and trustee and insurance services for covering risks attendant to owning or managing alternative assets.

- Financial Technology. Through Ben Markets Management Holdings, L.P., formerly called ACE Portal, L.L.C. ("ACE"), Beneficient plans to provide online portals and financial technologies for the trading and financing of alternative assets.[11]

42.     GWG stated that Ben's "existing and planned products and services are designed to support the tax and estate planning objectives of its MHNW clients, facilitate a diversification of assets or simply provide administrative management and reporting solutions tailored to the goals of the investor who owns alternative investments."[12]

43.     According to GWG, Ben began its "alternative asset business in September 2017" and "operate[d] primarily through its subsidiaries, which provide Beneficient's products and services." The subsidiaries included: (1) "[BCC], through which Beneficient offers loans and liquidity products;" (2) "[BACC], through which Beneficient provides services for fund and trust administration and plans to provide custody services;" (3) "[Pen], through which Beneficient plans to offer insurance services;" and (iv) "[ACE], through which Beneficient plans to provide an online portal for direct access to Beneficient's financial services and products."[13]

44.     GWG's first investments in Ben were made between August and December 2018 through a complex series of transactions collectively referred to in GWG's SEC filings as the "Exchange Transaction." In August 2018, GWG issued L Bonds to certain trusts ("Seller Trusts") affiliated with an associate of Defendant Heppner's, Murray Holland, the principal balance of which was subsequently adjusted to $366.9 million in December 2018. GWG also issued

---

[11] GWG Holdings, Inc., Annual Report at pp. 45-46 (Form 10-K) (Mar. 27, 2020).

[12] *Id.* at p 46.

[13] *Id.* at p. F-9.

approximately 27 million GWG common shares to the Seller Trusts.[14] In exchange, GWG received approximately 40.5 million Ben LP Units, purportedly worth approximately $360 million as of December 31, 2018, and a loan receivable from Ben that was eventually converted to Ben equity.

45.     Following the Exchange Transaction, from 2019 to 2021, GWG made several cash investments in Ben, ultimately transferring approximately $289 million to Ben and its affiliates. In exchange, GWG received either promissory notes or equity interests in Ben. The 2019-2021 transactions include the following:

- June and November 2019. GWG Life made a $65 million loan to six trusts affiliated with Ben, referred to as the "LiquidTrust Borrowers," pursuant to the terms of a promissory note. GWG stated that the purpose of the loan was to "further diversify into alternative assets (beyond life insurance) and ancillary businesses and . . . to better position [Ben's] balance sheet, working capital and liquidity profile to satisfy anticipated Texas Department of Banking regulatory requirements."[15]

- December 2019. GWG transferred $79 million of cash to Ben LP in exchange for 666,667 common units of Ben and an equity interest in Ben-affiliate Beneficient Company Holdings ("BCH").[16]

- 2020 and 2021. GWG made additional cash investments totaling approximately $145 million in exchange for equity interests in BCH.[17]

---

[14] *Id.* at pp. 2-3, F-36, F-38.

[15] *Id.* at p. 89.

[16] *Id.* at p. 90.

[17] GWG Holdings, Inc., Annual Report at p. F-66 (Form 10-K) (Nov. 5, 2021); OBC Complaint, ¶¶ 158-59.

### C.    Control of GWG Shifts to Ben

46.    Following the Exchange Transaction, and concurrently with GWG's ongoing investments in Ben, Ben and GWG came under common control. On April 15, 2019, GWG's founders, who were GWG's controlling stockholders, entered into an agreement to sell and transfer all of their GWG common shares to Ben. On April 26, 2019, the founders resigned from their executive management positions and from GWG's Board.[18] GWG's five other Board members also resigned.

47.    Concurrent with their resignations, GWG's founders relinquished control of GWG. The founders had maintained control over GWG through a voting agreement, even though they had not been majority owners since August 2018, when the Seller Trusts acquired approximately 79% of GWG's common shares through the Exchange Transaction.[19] The stockholders' agreement required the Seller Trusts' shares to be voted in proportion to the votes cast by all other stockholders. On April 26, 2019, however, the stockholders' agreement was terminated and the Seller Trusts became GWG's controlling stockholders.[20]

48.    As controlling stockholders, the Seller Trusts conferred upon Ben the power to designate GWG's Directors, and with it, the power to control GWG. On April 26, 2019, 11 Directors designated by Ben were appointed to GWG's Board, Defendant Heppner became the Chair of the Board, and Holland was appointed as CEO. Three additional Directors designated by Ben were appointed in May 2019.

49.    On December 31, 2019, upon acquiring BCH equity in exchange for a cash contribution (as alleged above in Part IV.B), GWG obtained a controlling financial interest in Ben,

---

[18] GWG Holdings, Inc., Annual Report at p. 48 (Form 10-K) (Mar. 27, 2020).

[19] GWG Holdings, Inc., Current Report, Ex. 10.2 (Form 8-K) (Jan. 4, 2019).

[20] GWG Holdings, Inc., Annual Report at p. 4 (Form 10-K) (Mar. 27, 2020).

and GWG began reporting the results of Ben and its subsidiaries on a consolidated basis. Ben, however, retained control of GWG's Board and thus remained in control of both entities.

### D.    False and Misleading Statements in the Registration Statement

50.    On July 1, 2020, GWG announced the Offering, which consisted of up to $2 billion in new L Bonds. GWG's press release quoted Holland, GWG's CEO: "We are excited to have a new $2 billion L Bond offering available now that can provide the income, stability, and return our advisors and investors have come to rely on from us since 2009."[21] GWG announced that a brokerage firm in San Mateo, California would serve as the managing broker-dealer for the offering, which would be sold through participating dealers and licensed financial advisors and representatives.

51.    The L Bonds sold in the Offering were registered under the federal securities laws pursuant to the Registration Statement. The signers of the Registration Statement included Individual Defendants Heppner, Cangany, Hicks, Lockhart and Schnitzer.[22]

52.    The Registration Statement incorporates by reference several SEC filings, including GWG's 2019 10-K and GWG's March 2020 Form 10-Q. The Registration Statement states:

We incorporate by reference the documents listed below:

- Our Annual Report on Form 10-K for the year ended December 31, 2019, filed with the SEC on March 27, 2020;

- Our Quarterly Report on Form 10-Q for the quarter ended March 31, 2020, filed with the SEC on May 15, 2020; and

---

[21] GWG Holdings, Inc., *GWG Holdings Introduces New $2 Billion L Bond Offering* (July 1, 2020, 4:30 p.m.), https://www.globenewswire.com/en/news-release/2020/07/01/2056545/0/en/GWG-Holdings-Introduces-New-2-Billion-L-Bond-Offering.html.

[22] GWG Holdings, Inc., Registration Statement at p. II-7 (Form S-1) (Mar. 30, 2020); GWG Holdings, Inc., Amendment No. 1 to Registration Statement at p. II-7 (Form S-1/A) (May 15, 2020).

- Our Current Reports on Form 8-K filed with the SEC on January 7, 2020, February 27, 2020, March 6, 2020, March 18, 2020 and March 20, 2020.

53.     Ben's Consolidated Financial Statements and Independent Auditor's Report, containing certain of Ben's financial statements for various periods between January 1, 2018 to December 31, 2019 (the "Ben Financial Statements"), are attached to the Registration Statement as an exhibit[23] and attached to the 2019 10-K as Exhibit 99.4,[24] and are accordingly incorporated by reference into the Registration Statement.

54.     The Registration Statement contained materially false and misleading representations and omissions in numerous areas, including: (1) Ben's business and operations; (2) Ben's financial performance and assets; (3) the integrity of GWG's financial statements; (4) the effectiveness of GWG's internal control over financial reporting; (5) the related party transactions associated with Ben's repayment of certain debts; and (6) the motivation for the resignations of GWG Directors in October 2019. Individually and collectively, these misrepresentations and omissions reveal a Registration Statement replete with falsehoods, as the Company's subsequent Restatement confirms.

**1.      The Registration Statement's False and Misleading Representations Concerning Ben's Business and Operations**

55.     GWG's 2019 10-K and the March 2020 10-Q describe Ben as a lending-and-service-based business. According to these SEC filings, Ben "provides a unique suite of private trust, lending and liquidity products" to "clients" holding alternative assets, with the alternative assets serving as collateral for Ben's loans.[25]

---

[23] GWG Holdings, Inc., Amendment No. 1 to Form S-1 Registration Statement, Ex. 99.4 (Form S-1/A) (May 15, 2020).

[24] GWG Holdings, Inc., Annual Report, Ex. 99.4 (Form 10-K) (Mar. 27, 2020).

[25] GWG Holdings, Inc., Annual Report at p. 45 (Form 10-K) (Mar. 27, 2020); GWG Holdings, Inc., Quarterly Report at p. 52 (Form 10-Q) (May 15, 2020).

56.     The 2019 10-K (incorporated into the Registration Statement) describes Ben's "primary operations" as follows:

> Beneficient's primary operations pertain to its liquidity products whereby Ben LP, through its subsidiaries, extends loans collateralized by cash flows from illiquid alternative assets and provides services to the trustees who administer the collateral. Beneficient's core business products are its Exchange Trust, LiquidTrust, and the InterChange Trust (introduced in 2020). Beneficient's clients select one of these products and place their alternative assets into the custody trust that is a constituent member of a trust structure called the "ExAlt Plan™" (comprised of Exchange Trusts, LiquidTrusts, Custody Trusts, Collective Trusts, and Funding Trusts). The ExAlt Plan™ then delivers to Beneficient's clients the consideration required by the specific product selected by Beneficient's clients. At the same time, Beneficient, through a subsidiary, extends a loan to the ExAlt Plan™. The proceeds (cash or securities of Ben LP or its affiliates) of that loan to the ExAlt Plan™ are ultimately paid to the client. The cash flows from the client's alternative asset support the repayment of the loans plus any related interest and fees.[26]

57.     In other words, the Registration Statement says that Ben's client selects one of Ben's products; Ben, through a subsidiary, then extends a loan to a borrower trust in the form of cash or Ben securities; the borrower trust then delivers the loan proceeds to the client in exchange for the client's alternative assets; and the cashflows from the alternative assets acquired by the borrower trust collateralize Ben's loan.

58.     Similarly, the Registration Statement says that:

> Beneficient provides private trust solutions, including a unique suite of lending and liquidity products focused on bringing liquidity to owners of alternative assets. Beneficient's innovative liquidity solutions are designed to serve MHNW individuals, STM institutions, and asset managers who have historically possessed few attractive options to access early liquidity from their alternative assets. Beneficient targets MHNW individual clients with $5 million to $30 million in investments and institutional clients typically holding less than $1 billion in assets.[27]

59.     Further, the 2019 10-K characterizes Ben's borrowers as "unaffiliated trusts":

---

[26] GWG Holdings, Inc., Annual Report at p. 10 (Form 10-K) (Mar. 27, 2020).

[27] GWG Holdings, Inc., Amendment No. 1 to Form S-1 Registration Statement, at p. 3 (Form S-1/A) (May 15, 2020).

> Beneficient's Liquidity Transactions are structured as loans from [its] subsidiary to unaffiliated trusts that acquire ownership interests in the alternative assets comprising the collateral supporting [its] Liquidity Transactions . . . .[28]

60.    The 2019 10-K and March 2020 10-Q also say that Ben provides trust administration services to the trustees administering the loan collateral.

61.    The March 2020 10-Q says Ben has two sources of revenue: (1) interest income from its loan receivables; and (2) trust administration fees for services provided to trustees. Specifically, that SEC filing states:

> **Interest Income.** We earn interest income primarily on Beneficient's loans receivable and the promissory note receivable from the LiquidTrusts. Although Beneficient has originated a limited number of loans to date, we expect interest income to continue to increase as Beneficient expands its operations if and when the trust charters are issued.[29]

> **Trust Services.** Trust administration fees are earned for providing administrative services to trustees for existing liquidity solution clients. . . . Fees are recognized monthly based upon the beginning of quarter (in advance) net asset value plus any remaining unfunded loan commitments and the applicable fee rate of the account as outlined in the agreement.[30]

62.    Ben's financial statements imply that it had begun to implement its business plan by completing a "limited number" of transactions:

> Through December 31, 2019, Ben's originations of liquidity products have primarily been limited to the Initial and Second Transactions described above. The Initial and Second Transactions have been transacted with a limited number of family offices, fund-of-funds and institutions. These types of clients, specifically, fund-of-funds and institutions represent a smaller segment of the target market for Ben's financial products in the future.[31]

---

[28] GWG Holdings, Inc., Annual Report at p. 33 (Form 10-K) (Mar. 27, 2020).

[29] GWG Holdings, Inc., Quarterly Report at p. 71 (Form 10-Q) (May 15, 2020).

[30] *Id.* at p. 60.

[31] GWG Holdings, Inc., Annual Report, Ex. 99.4 at p. 18 (Form 10-K) (Mar. 27, 2020).

63.     The Registration Statement portrays Ben as beginning to execute a lending-and-service-based business model, generating $13 million of interest income during the three months ended March 31, 2020, from a $219 million loan portfolio collateralized by assets worth $351 million, and generating $5 million in fees. Ben's business as of the period covered by the Registration Statement, however, was *not* to provide "liquidity products" by making loans to unaffiliated trusts or by providing administrative services to the trustees administering the loan collateral.[32] Instead, Ben itself had effectively obtained beneficial ownership of alternative assets, and its investments in these assets were unsecured and had declined in value.

64.     The trusts that had acquired the alternative assets collateralizing Ben's loans were Ben subsidiaries—meaning that Ben's primary tangible assets were the alternative assets themselves, not loans receivable. Ben was acting as an investor, not a lender.

65.     Beginning in September 2017, through a series of complex transactions involving Ben, GWG and a group of funds (the "Paul Capital Funds") managed by Paul Capital Advisors LLC ("Paul Capital"), Ben had acquired an alternative asset portfolio valued at approximately $500 million. Nearly all of Ben's alternative asset portfolio during the Offering Period consisted of securities acquired through these transactions.

66.     GWG did not disclose that substantially all of Ben's portfolio was acquired through the deal with Paul Capital, and not as a result of Ben's deployment of "innovative liquidity solutions . . . designed to serve mid-to-high net worth ('MHNW') individuals, small-to-mid sized ('STM') institutions, and asset managers" to "access early liquidity from their alternative assets."[33] The Paul Capital transaction came to light in February 2022 when Paul Capital sued Ben in the

---

[32] GWG Holdings, Inc., Annual Report at p. 45 (Form 10-K) (Mar. 27, 2020); GWG Holdings, Inc., Quarterly Report at p. 52 (Form 10-Q) (May 15, 2020).
[33] GWG Holdings, Inc., Annual Report at p. 2 (Form 10-K) (Mar. 27, 2020).

Court of Chancery of the State of Delaware alleging, in substance, that the Paul Capital Funds were cheated in the transaction and never received the promised liquidity.[34] Ben's own pleadings in that case make clear that Ben, and not any third-party borrower of Ben, intended to purchase, and in fact purchased, the alternative assets, and further, that these assets were not acquired in connection with any "product" purportedly offered by Ben as described in the Registration Statement.[35]

67.     On November 5, 2021, GWG filed the 2020 10-K, which restated the Company's financial statements[36] for the year ended December 31, 2019, and the quarters ended March 31, 2020, June 30, 2020, and September 30, 2020. As such, this Restatement encompassed GWG's financial statements for the Offering Period.

68.     In announcing the Restatement in the 2020 10-K, GWG stated in relevant part:

In this Annual Report on Form 10-K for the year ended December 31, 2020 (the "2020 Form 10-K"), GWG Holdings, Inc. is restating its previously issued (i) consolidated balance sheet as of December 31, 2019, (ii) the consolidated statement of operations, (iii) the consolidated statement of changes in stockholders' equity, and (iv) the consolidated statement of cash flows for the year ended December 31, 2019, included in its Annual Report on Form 10-K for the year ended December 31, 2019, (the "Restatement"). The Restatement also impacted each of the quarters for the periods beginning with GWG Holdings, Inc.'s consolidation with The Beneficient Company Group, L.P. ("Ben LP," including all of the subsidiaries it may have from time to time — "Beneficient") as of December 31, 2019 through the quarter ended September 30, 2020.[37]

69.     The Restatement materially affected several of GWG's previous financial statements, as well as information furnished in its MD&A (Management's Discussion and

---

[34] *Paul Capital Advisors, L.L.C., et al. v. Murray T. Holland, et al.*, No. 2022-0167 (Del. Ch.).

[35] *See, e.g., id.*, Opening Brief of Defendants in Support of Their Motion to Dismiss Counts III Through VIII of the Verified Second Amended Complaint at p. 5 (filed Nov. 1, 2022) ("To exit the private equity market, [Paul Capital] first needed to dissolve and wind-up its operations, including the [Paul Capital Funds] which could only distribute cash to their limited partners. **That meant finding a buyer willing to purchase the [Paul Capital Funds'] illiquid securities. [The Paul Capital Funds] found such a buyer in [Ben].**") (emphasis added).

[36] The financial statements in the 2020 10-K were audited by Grant Thornton LLP.

[37] GWG Holdings, Inc., Annual Report at p. i (Form 10-K) (Nov. 5, 2021).

Analysis of Financial Condition and Results of Operations). The Restatement centered on the accounting treatment of the "ExAlt Trusts"—the entities to which Ben purportedly made loans and provided services in connection with its "liquidity products," which GWG described in the 2019 10-K as "unaffiliated trusts." With the Restatement, GWG acknowledged that these entities were not "unaffiliated," but were instead Ben subsidiaries, and that GWG had repeatedly failed to properly account for Ben's controlling financial interest in them.

70.    The Restatement clarified that:

> Prior to December 31, 2019, only certain trusts created through Beneficient's ExAlt Plan$^{TM}$ were considered variable interest entities for which Ben LP had a variable interest and was considered the primary beneficiary. Thus, Ben LP was required to consolidate certain of such trusts. Due to changes to both the governance structure and the underlying economics of the trust and other agreements pertaining to certain of the ExAlt Trusts and the execution of new loan agreements between a subsidiary of Ben LP and certain of such trusts as of December 31, 2019, it was initially concluded that Ben LP no longer had the power to direct the activities that most significantly impact the economic performance of any of the ExAlt Trusts and therefore could no longer consolidate any of such trusts as of December 31, 2019, including those previously consolidated. However, we have since determined that **such conclusion was incorrect**, and that the proper application of generally accepted accounting principles is for Ben LP to consolidate all of the ExAlt Trusts. As a result of consolidating such trusts, Ben LP's primary tangible asset, which was acquired through loans a subsidiary of Ben LP made to certain of the ExAlt Trusts, was **previously reported as a loan receivable as of December 31, 2019, but is now being reported as an investment in alternative assets** held by certain of the ExAlt Trusts.[38]

71.    Thus, as GWG conceded in the Restatement, the Registration Statement contained false representations regarding Ben's core business.

### 2.    The Registration Statement's False and Misleading Representations Concerning Ben's Financial Performance and Assets

72.    The financial statements in the March 2020 10-Q represent that, during the first quarter of 2020, Ben had interest income from its loan portfolio of approximately $13.4 million.

---

[38] *Id.* (emphasis added).

The financial statements in the 2019 10-K and March 2020 10-Q say that Ben's loan portfolio had an approximate net carrying value of $232.3 million and $218.6 million as of December 31, 2019 and March 31, 2020, respectively. The March 2020 10-Q further states that Ben's loans are collateralized by alternative assets with an estimated net asset value ("NAV") of approximately $350.7 million.

73.     In addition to interest income, the March 2020 10-Q says Ben had trust administration services revenue of approximately $5.0 million during the first quarter of 2020.

74.     The 2019 10-K and the March 2020 10-Q say Ben had fees receivable, representing upfront fees and trust administration fees that Ben expected to receive for services already performed, of approximately $29.2 million and $30.5 million as of December 31, 2019 and March 31, 2020 respectively.

75.     None of these representations about Ben's finances was accurate. The following tables demonstrate the impact of the Restatement on GWG's consolidated balance sheets:

**Fiscal 2019**[39]

| ($ in thousands) | As Reported 12/31/2019 | Adjustments | As Restated 12/31/2019 |
|---|---|---|---|
| **Assets** | | | |
| Investment in alternative assets, at NAV | $0 | $342,012 | $342,012 |
| Loan receivables, net of discount | $232,344 | ($232,344) | $0 |
| Fees receivable | $29,168 | ($29,168) | $0 |
| Financing receivables from affiliates | $67,153 | ($67,153) | $0 |
| **Liabilities** | | | |
| Deferred revenue | $41,444 | ($41,444) | $0 |
| Repurchase option | $0 | $61,664 | $61,664 |
| **Equity** | | | |
| Accumulated deficit | ($76,501) | ($20,695) | ($97,196) |
| Total GWG Stockholders' Equity[40] | $333,979 | ($20,695) | $313,284 |
| Total Stockholders' Equity | $600,827 | $6,367 | $607,194 |

**1Q 2020**[41]

| ($ in thousands) | As Reported 3/31/2020 | Adjustments | As Restated 3/31/2020 |
|---|---|---|---|
| **Assets** | | | |
| Investment in alternative assets, at NAV | $0 | $335,487 | $335,487 |
| Loan receivables, net | $218,596 | ($218,596) | $0 |
| Fees receivable | $30,453 | ($30,453) | $0 |
| Financing receivables from affiliates | $68,290 | ($68,290) | $0 |
| **Liabilities** | | | |
| Deferred revenue | $39,651 | ($39,651) | $0 |
| Repurchase option | $0 | $51,052 | $51,052 |
| **Equity** | | | |
| Accumulated deficit | ($121,933) | ($18,634) | ($140,567) |
| Total GWG Stockholders' Equity | 269,415 | ($18,634) | $250,781 |
| Total Stockholders' Equity | $601,126 | ($2,176) | $598,950 |

---

[39] *Id.* at pp. F-69 – F-76.

[40] In GWG's financial reporting, "GWG Stockholders' Equity" is distinct from "Total Stockholders' Equity." "Total Stockholders' Equity" includes both "GWG Stockholders' Equity" and noncontrolling interests.

[41] GWG Holdings, Inc., Annual Report at pp. F-72 – F-76 (Form 10-K) (Nov. 5, 2021).

76.     As these tables show, the Restatement's adjustments to Ben's assets and liabilities had the effect of increasing GWG's accumulated deficit for the periods ended December 31, 2019 and March 31, 2020, by approximately $20.7 million and $18.6 million, respectively.

77.     Moreover, because Ben actually made loans to its own consolidated subsidiaries rather than to "unaffiliated trusts," any interest received from these borrowers was an intra-company transfer. The Restatement consequently eliminated Ben's previously reported interest income. Likewise, because Ben's services were only provided to its subsidiaries, the Restatement eliminated all of Ben's previously reported income for trust administration services.

78.     Thus the Restatement materially reduced Ben's revenue, and materially increased its reported net loss before income taxes, for the period ended March 31, 2020, as compared to the figures reported in the financial statements incorporated into the Registration Statement. For the period ended March 31, 2020, the Restatement eliminated interest income of approximately $13 million and trust services income of approximately $5 million.

79.     These changes to the previously reported revenues—reflecting decreases in Ben's reported revenue compared to what GWG previously reported—and the changes to GWG's own net loss before income taxes for the first quarter of 2020, can be summarized as follows:

**1Q 2020**[42]

|  | YTD Period Ended |
| --- | --- |
| *($ in thousands)* | **3/31/2020** |
| Reduction in reported revenue | ($10,745) |
| Percentage reduction | (32.0%) |
| Increase in reported net loss before income taxes | ($10,045) |
| Percentage increase | (11.1%) |

---

[42] *Id.*

80.     The corrected, significantly reduced revenue and increased net loss disclosed in the Restatement show that GWG's prior disclosures in the Registration Statement were materially false and inaccurate.

### 3.     The Registration Statement's False and Misleading Representations Concerning Ben's Goodwill

81.     GWG's 2019 10-K says that Ben had goodwill of approximately $1.5 billion as of December 31, 2018.[43] Starting on December 31, 2019, the date on which GWG consolidated Ben, the goodwill attributable to Ben was reported as an asset on GWG's balance sheet. The 2019 10-K says that GWG had goodwill of $2.4 billion attributable to Ben as of December 31, 2019.[44]

82.     The 2019 10-K reported goodwill as an asset representing the difference between (i) Ben's overall enterprise value and (ii) the net value of the assets and liabilities attributable to Ben.[45] Goodwill was accordingly a function of Ben's purported enterprise value.

83.     As of December 31, 2018, GWG reported that Ben had goodwill of approximately $1.5 billion, implying Ben's enterprise value was approximately $1.4 billion, as Ben's reported liabilities exceeded its reported assets (other than goodwill) by approximately $0.1 billion.[46] Similarly, as of December 31, 2019, GWG's financial statements reported goodwill attributable to Ben of $2.4 billion, implying Ben's enterprise value was approximately $2.3 billion, as the value of the reported liabilities attributable to Ben exceeded the reported assets attributable to Ben (other than goodwill) by approximately $0.1 billion.[47]

---

[43] GWG Holdings, Inc., Annual Report, Ex. 99.4 at p. 3 (Form 10-K) (Mar. 27, 2020).

[44] GWG Holdings, Inc., Annual Report at p. F-4 (Form 10-K) (Mar. 27, 2020).

[45] *Id.* at p. F-23.

[46] GWG Holdings, Inc., Annual Report, Ex. 99.4 at p. 3 (Form 10-K) (Mar. 27, 2020).

[47] GWG Holdings, Inc., Annual Report at p. F-4 (Form 10-K) (Mar. 27, 2020).

84.     According to GWG's 2019 10-K, Ben's enterprise value was determined using the "Option Pricing Model ('OPM') Backsolve approach under the market method" ("OPM Backsolve Approach").[48] That method relies on, among other inputs, the fair value for at least one component of an entity's capital structure (e.g., the entity's common limited partnership units).[49] Such values must be derived using arm's-length transactions involving the component securities.[50] An example of such transaction is the purchase of the securities by an informed and sophisticated third party.

85.     Although GAAP required GWG to detail the inputs used to determine Ben's valuation, GWG failed to identify the third-party transaction upon which the valuation of the Ben securities, used as an input in determining Ben's enterprise value under the OPM Backsolve Approach, was based.

86.     There was no *bona fide* arm's-length transaction of any Ben securities supporting the aforementioned valuations ascribed to Ben. Further, Ben's business and prospects did not justify these valuations. As alleged above in Part IV.D.1, Ben was not generating any interest or service revenue as its loans and services were only provided to its own subsidiaries. Ben had acquired a portfolio of alternative assets, and as of December 31, 2019, the value of Ben's alternative asset portfolio was $342 million, and it had debt of approximately $153 million and other liabilities.[51] These facts, admitted in the Restatement, reveal that if Ben had any value at all, its value was only fraction of the inflated value ascribed to it.

---

[48] *Id.* at p. F-23.

[49] *See id.*

[50] *See* GWG Holdings, Inc., Annual Report at p. F-56 (Form 10-K) (Nov. 5, 2021) ("These valuation techniques relied upon the **OPM Backsolve approach under the market method** . . . . For awards [of Ben restricted equity units] granted in 2019, the fair value of [the restricted equity units] was estimated using **recent equity transactions involving third parties, which provided the Company with observable fair value information** sufficient for estimating the grant date fair value.") (Emphasis added).

[51] GWG Holdings, Inc., Annual Report at p. F-6 (Form 10-K) (Nov. 5, 2021).

87.     Since Ben's enterprise valuations as of December 31, 2018 and December 31, 2019 were materially inflated, the goodwill valuations attributable to Ben as reported in GWG's 2019 10-K as of these dates were also materially inflated.

88.     By attributing materially inflated goodwill valuations to Ben, the Registration Statement falsely portrayed Ben as worth approximately $1.4 billion as of December 31, 2018 and $2.3 billion as of December 31, 2019. In reality, Ben had little, if any, value, particularly to GWG whose interest in Ben was junior to over $1 billion in preferred equity owned primarily by Ben insiders at these times.[52] These facts would have been material to a reasonable investor assessing GWG's strategy of investing in Ben and GWG's ability to satisfy the claims of L Bond holders in the event of default.

### 4.     The Registration Statement's False and Misleading Representations Concerning GWG's Internal Control Over Financial Reporting

89.     The Registration Statement also says that Whitley Penn audited GWG's 2019 financial statements, and the effectiveness of GWG's internal control over financial reporting:

> The consolidated financial statements of GWG Holdings, Inc. and its subsidiaries for the year ended December 31, 2019 incorporated by reference in this prospectus from GWG Holdings, Inc.'s Annual Report on Form 10-K for the year ended December 31, 2019 and the effectiveness of GWG Holdings, Inc.'s internal control over financial reporting as of December 31, 2019 have been audited by Whitley Penn LLP, independent registered public accounting firm, as set forth in their reports thereon, which are incorporated herein by reference.[53]

90.     The 2019 10-K includes as Item 8 a "Report of Independent Registered Public Accounting Firm," signed by Whitley Penn:

**Opinion on Financial Statements**

We have audited the accompanying consolidated balance sheet of GWG Holdings, Inc. and Subsidiaries (the "Company") as of December 31, 2019, and the related

---

[52] *Id.* at p. F-22; GWG Holdings, Inc., Annual Report, Ex. 99.4 at p. 24 (Form 10-K) (Mar. 27, 2020).

[53] GWG Holdings, Inc., Prospectus at p. 40 (Form 424B1) (June 5, 2020).

consolidated statements of operations, changes in stockholders' equity, and cash flows for the year ended December 31, 2019, and the related notes . . . . In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2019, and the results of their operations and their cash flows for the year ended December 31, 2019, in conformity with accounting principles generally accepted in the United States of America.

. . .

**Opinion on Internal Control Over Financial Reporting**

We have audited GWG Holdings, Inc. and Subsidiaries (the "Company") internal control over financial reporting as of December 31, 2019, based on criteria established in *2013 Internal Control—Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO). In our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2019, based on criteria established in *2013 Internal Control—Integrated Framework* issued by COSO.[54]

91.     Whitley Penn consented to the incorporation by reference of its report on GWG's consolidated financial statements and the effectiveness of its internal controls into the Registration Statement. The Registration Statement includes as an exhibit a "Consent of Independent Registered Public Accounting Firm" that provides in relevant part:

We consent to the incorporation by reference in the Registration Statement . . . of GWG Holdings, Inc. and GWG Life, LLC of our reports dated March 27, 2020, relating to the consolidated financial statements and the effectiveness of internal control over financial reporting of GWG Holdings, Inc. and Subsidiaries, which appear in the annual report on Form 10-K of GWG Holdings, Inc. as of and for the year ended December 31, 2019.

We consent to the incorporation by reference in the Registration Statement . . . of GWG Holdings, Inc. and GWG Life, LLC of our report dated March 27, 2020, relating to the consolidated financial statements of the Beneficient Company Group, L.P., and Subsidiaries, which appear in the annual report on Form 10-K of GWG Holdings, Inc. for the year ended December 31, 2019.

We also consent to the reference to us under the heading "Experts" in such Registration Statement.[55]

---

[54] GWG Holdings, Inc., Annual Report at pp. F-1 – F-2 (Form 10-K) (Mar. 27, 2020).

[55] GWG Holdings, Inc., Amendment No. 1 to Form S-1 Registration Statement, Ex. 23.1 (Form S-1/A) (May 15, 2020).

92. With the Restatement, GWG admitted that its representations concerning internal controls were inaccurate. The 2020 10-K details management's report on GWG's internal controls as follows:

> In connection with matters related to the Restatement, we have determined that *a material weakness existed in our internal control over financial reporting* for all periods from December 31, 2019 to December 31, 2020. As of December 31, 2020, the design and operating effectiveness of controls over the selection, application and review of the implementation of accounting policies were *not sufficient to ensure amounts recorded and disclosed were fairly stated in accordance with GAAP*. This material weakness resulted in the Restatement. In addition, not solely as a result of this material weakness, GWG Holdings, Inc.'s Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures were *not effective* for the year ended December 31, 2020.[56]

93. Regulation S-X sets forth the definition of "material weakness" as it relates to internal controls over financial reporting:

> Material weakness means a deficiency, or a combination of deficiencies, in internal control over financial reporting . . . such that there is a reasonable possibility that a material misstatement of the registrant's annual or interim financial statements would not be prevented or detected on a timely basis.[57]

94. Contrary to the representations in the 2019 10-K that GWG maintained effective internal control over financial reporting as of December 31, 2019, GWG conceded with the Restatement that it had "determined that a material weakness existed in [its] internal control over financial reporting," and that this weakness meant GWG could not "ensure amounts recorded and disclosed were fairly stated in accordance with GAAP," resulting in the Restatement.[58]

95. The Registration Statement materially misrepresented GWG's internal control over financial reporting as effective. GWG was required but failed to communicate in the Registration

---

[56] GWG Holdings, Inc., Annual Report at p. i (Form 10-K) (Nov. 5, 2021) (emphasis added).

[57] 17 C.F.R. § 210.1(a)(4).

[58] GWG Holdings, Inc., Annual Report at p. i (Form 10-K) (Nov. 5, 2021).

Statement the material weakness of its internal control—particularly because that weakness substantially increased the risk of GWG's financial statements being materially misstated.

> **5.    The Registration Statement's False and Misleading Representations Concerning Related Party Transactions in the Form of Repayment of Certain Ben Indebtedness**

96.    Ben's 2019 financial statements say that Ben, through a subsidiary, entered into a loan agreement with HCLP Nominees, LLC ("HCLP") on September 1, 2017, to refinance Ben's existing loans. They further say that "[t]he aggregate principal amount refinanced by the Company, including $20.2 million related to the purchase of certain assets, totaled $141.0 million on a total advance commitment amount of $146.0 million."[59]

97.    With respect to Ben's indebtedness, the 2019 10-K states in relevant part:

> Beneficient had borrowings with an aggregate fair value of $153.1 upon consolidation as of December 31, 2019. This aggregate balance includes a senior credit agreement and a second lien credit agreement with respective balances, including accrued interest, of $77.5 million and $7.2 million at December 31, 2019. Both the senior credit agreement and the second lien credit agreement were held by HCLP as of December 31, 2019. . . . Ben LP intends to repay with cash or refinance with other third-party lenders the senior credit agreement and the second lien credit agreement prior to their maturities, both of which are on June 30, 2020. Ben LP may not be able to refinance or obtain additional financing on favorable terms, or at all. If Ben LP is unable to refinance the senior credit agreement or the second lien credit agreement, or defaults on either loan, then Ben LP will be required either: (i) sell assets to repay these loans or (ii) to raise additional capital through the sale of equity and the ownership interest of Ben LP's equity holders may be diluted. These loans are not guaranteed by GWG.[60]

98.    The March 2020 10-Q similarly says Ben had indebtedness of approximately $153 million, as of both December 31, 2019 and March 31, 2020.[61]

---

[59] GWG Holdings, Inc., Annual Report, Ex. 99.4 at p. 31 (Form 10-K) (Mar. 27, 2020).

[60] GWG Holdings, Inc., Annual Report at p. F-36 (Form 10-K) (Mar. 27, 2020).

[61] GWG Holdings, Inc., Quarterly Report at p. 32 (Form 10-Q) (May 15, 2020).

99.     The 2019 10-K says that Ben made a loan payment to HCLP of approximately $49.8 million during the fourth quarter of 2019.[62]

100.    The 2019 10-K does not disclose Ben's $49.8 million loan payment to HCLP as a related party transaction, stating instead that "HCLP is not considered a related party of GWG Holdings or Beneficient."[63]

101.    In the 2020 10-K (filed in November 2021), however, Ben's $49.8 million loan payment to HCLP is identified as one of a series of related party transactions in which Defendant Heppner was an interested party. In the "Transactions with Related Persons Section," the 2020 10-K says GWG made cash investments in Ben, that Ben made a loan payment to HCLP using a portion of those funds, and that HCLP's affiliates then transferred at least a portion of those funds to Heppner's affiliates:

> From time to time, Highland or its affiliates have advanced funds under various lending and investing arrangements to the Ben Founder Affiliates. . . . Such loans to and investments with or in the Ben Founder Affiliates have been and may be made by Highland, or its affiliates, as applicable, using proceeds from loan repayments made by Beneficient to HCLP in its capacity as Senior Lender to Beneficient, with such loan repayments made potentially using cash from GWG Holdings' and GWG Life's investments in Beneficient.[64]

102.    The funds that were transferred from GWG to Heppner's affiliates (through Ben, HCLP and HCLP's affiliates) were L Bond proceeds. On December 31, 2019, GWG made a $79 million cash investment in Ben using funds from GWG's L Bond-specific bank accounts.[65] That same day, Ben made the $49.8 million payment to HCLP using funds it had just received from GWG. HCLP's affiliates then transferred some portion of those funds to Heppner's affiliates.

---

[62] GWG Holdings, Inc., Annual Report, Ex. 99.4 at p. 32 (Form 10-K) (Mar. 27, 2020).

[63] GWG Holdings, Inc., Annual Report, at pp. F-30, 90 (Form 10-K) (Mar. 27, 2020).

[64] GWG Holdings, Inc., Annual Report at p. F-66 (Form 10-K) (Nov. 5, 2021).

[65] OBC Complaint, ¶ 154.

103.    Not only did Heppner have an interest in these transactions because funds were transferred to his affiliates, Heppner also was an interested party because a substantial portion of Ben's debt (which was partially satisfied) was incurred to purchase property belonging to him, a fact that GWG has never disclosed. Before September 2017, Heppner or his affiliates incurred substantial debt arising out of loans to or for the benefit of Heppner or his affiliates made by HCLP-affiliated trusts that Heppner dominated and controlled.[66] A portion of that debt was incurred to purchase and develop real property—a ranch—worth approximately $57 million.

104.    In September 2017, when Ben entered the alternative asset business, Ben divested the ranch to a Heppner affiliate; however, the debt incurred to purchase and develop the ranch (as well as other debt linked to Heppner personally) remained on Ben's balance sheet. Concurrent with the divestment of the ranch, HCLP—an affiliate of the trusts that originally extended the loans to Heppner—refinanced Ben's debt.

105.    Because GWG's $79 million investment in Ben in 2019, and Ben's concurrent $49.8 million payment to HCLP, were related party transactions (as GWG acknowledged in its 2020 10-K), GWG was required under SEC Regulation S-X Item 404(a), 17 C.F.R. § 229.404(a), to disclose in the Registration Statement Heppner's interest in the transactions, their approximate value and any additional information related to the transactions material to investors given the circumstances, including the fact that Ben's payment was made in partial satisfaction of debt that Heppner incurred for the purchase and development of his $57 million ranch.

106.    The fact that Ben was responsible for debt connected to Heppner's ranch, and that L Bond proceeds had been used in December 2019 to service debt connected to Heppner's ranch, instead of being used to fund Ben's business or retire debt related to business expense, was

---

[66] *Id.* at ¶ 111.

material. Likewise, the fact that L Bond proceeds had been transferred to or for the benefit of Heppner or his affiliates (through Ben, HCLP, and HCLP's affiliates) was material. These facts would have mattered to a reasonable investor assessing GWG's strategic focus on investing in Ben, the independence and competence of GWG's Board, the candor of GWG's management, and the motivations of Heppner and related parties. In deciding whether to acquire in L Bonds in the Offering, a reasonable investor would have considered it important that Ben was responsible for debt connected to Heppner's personal property, that a substantial portion of the proceeds of earlier L Bond sales had been applied in related party transactions to service debt connected with Heppner's personal property, and that L Bond proceeds had also been transferred to Heppner's affiliates. These disclosures also would have been material to a reasonable investor's consideration of the Registration Statement's disclosures concerning the use of the proceeds of the Offering and the Registration Statement's risk factor disclosures.

107.    To meet its obligations to L Bond holders, GWG needed to efficiently allocate its capital to investments that would increase its assets and future earnings without delay. The Registration Statement said that GWG's investments in Ben would "provide [GWG] with a significant increase in assets" and an "opportunity for a diversified source of future earnings." The use of GWG L Bond proceeds in 2019 to repay approximately $49.8 million of debt associated with Heppner's ranch was unrelated to increasing GWG's assets or creating a diversified source of future earnings. The Registration Statement did not adequately disclose the repayment of indebtedness associated with Heppner's personal property and failed entirely to disclose that no valid business purpose existed for GWG to invest in developing a new business through a company burdened with unrelated debts.

**6.      The Registration Statement's False and Misleading Representations Concerning Resignations of Certain Directors in October 2019**

108.    GWG's 2019 10-K says that Board members David H. Glaser, Sheldon I. Stein, Bruce E. Zimmerman, and Richard W. Fisher "ceased serving as a member of the Board of Directors on October 15, 2019."[67] The 2019 10-K further states that "[t]he size of the Board has since been reduced and currently consists of nine directors."[68]

109.    The Registration Statement explains that "four members of the Board of Directors resigned as directors of the Company, and the size of the Board of Directors was reduced from 14 to ten directors in order to facilitate the Board of Directors' ability to oversee the Company's operations in an efficient and effective manner."[69] That representation was false and misleading.

110.    In August 2019, three GWG Board members—David H. Glaser, Sheldon I. Stein, and Bruce E. Zimmerman, each of whom was also a Ben director at that time—expressed concerns to Heppner about GWG's investments in Ben and Ben's payments to related parties.[70] Zimmerman emailed Heppner that he was "quite concerned" about GWG's cash on hand. Zimmerman further wrote in his email that "no money should be sent from GWG to Ben" until an asset and liability analysis was completed, and that he opposed Ben "making any more related party payments."[71]

111.    Stein emailed Heppner that he was "in total agreement" with Zimmerman, payments from GWG to Ben to related parties were "unacceptable," he was "totally opposed" to those payments, and the situation was "a major liability issue at the GWG level." Stein further wrote in his email that he "saw debt increasing" but "never saw assets, tangible assets, increase"—

---

[67] GWG Holdings, Inc., Annual Report at p. 84 (Form 10-K) (Mar. 27, 2020).

[68] *Id.* at p. 4.

[69] GWG Holdings, Inc., Prospectus at p. 2 (Form 424B1) (June 5, 2020).

[70] OBC Complaint, ¶ 208.

[71] *Id.*

a pattern that caused him to be concerned about the Company's ability to satisfy its obligations to L Bond holders.[72]

112.    In separate email correspondence that included Glaser, Stein wrote that he had been led to believe there was "plenty of equity" in Ben from Heppner's money contributions, but that he had recently learned that Ben's cash "seems to all be from related parties in the form of debt."[73] Stein further noted that he and Glaser had become aware of "how little of the bond sale proceeds were really going into buying assets," and that "Brad's plan was to also use future cash flows to pay related parties."[74]

113.    Stein asked GWG's management for documents shedding light on Ben's long-term business plans, cash flows, and capitalization. But GWG's management failed to provide satisfactory documents and information in response to Stein's requests—he wrote that he had been "totally kept in the dark as to the capitalization and cash flow of this business."[75] GWG's management also failed to adequately respond to similar concerns raised by Glaser and Zimmerman.[76]

114.    Consequently, in October 2019 Glaser, Stein, and Zimmerman resigned from the Company's Board.

115.    The Registration Statement nowhere discloses that Glaser, Stein and Zimmerman's resignations resulted from their disagreements with GWG management and from management's failure to put to rest these Directors' concerns about GWG's investments in Ben and to provide sufficient documents and information in response to Stein's requests. Instead, the Registration

---

[72] *Id.* at ¶¶ 208-09.

[73] *Id.* at ¶ 209.

[74] *Id.*

[75] *Id.* at ¶ 210.

[76] *Id.* at ¶ 211.

Statement describes a reduction in Board size as a measure to streamline and improve corporate governance: "[F]our members of the Board of Directors resigned as directors of the Company, and the size of the Board of Directors was reduced from 14 to ten directors in order to facilitate the Board of Directors' ability to oversee the Company's operations in an efficient and effective manner."[77]

116.    A reasonable investor deciding whether to acquire GWG L Bonds in the Offering would have found it material that these Directors stepped down, not to facilitate the Board's "ability to oversee . . . operations in an efficient and effective manner" as represented, but out of concern over GWG's investments in Ben and Ben's related party transactions and due to management's failure to adequately address their concerns.

117.    The reasons for Glaser, Stein, and Zimmerman's resignations were especially important given GWG's concurrent shift in business focus to investment in Ben. By failing to disclose the resigning Directors' concerns about GWG's investments in Ben, the Registration Statement created the impression that GWG's board was functioning effectively, GWG had reduced its board size for valid business reasons, and none of GWG's directors had questioned GWG's investments in Ben. In fact, the resigning Directors thought the cash investments GWG had made, and proposed to make, in Ben were suspect, and a potential source of legal liability.

E.    **The Registration Statement's False and Misleading Representations Concerning GWG's Business and Finances Were Material to Investors**

118.    GWG's swift collapse when the falsehoods in the Registration Statement concerning Ben's true business and financial state, and GWG's poor accounting controls, were revealed through the Restatement in November 2021 confirms their materiality. In the wake of the

---

[77] GWG Holdings, Inc., Prospectus at p. 2 (Form 424B1) (June 5, 2020).

Restatement, GWG found few buyers for its L Bonds and encountered resistance from its network of sales agents. So too would these misrepresented facts have mattered to investors' decisions as to whether to acquire GWG L Bonds in the Offering.

### 1. GWG Misses Its 2020 10-K Filing Deadline and Suspends the Offering

119.   GWG was required to file the 2020 10-K by March 31, 2021. On April 1, 2021, GWG filed a Form NT 10-K "Notification of Late Filing" disclosing its inability to file its 10-K within the prescribed time. It filed Form NT 10-Qs on May 18 and August 17, 2021, disclosing its inability to timely file its first and second quarter 2021 10-Qs.

120.   On August 3, 2021, GWG filed a Current Report on Form 8-K disclosing that it would restate its 2019 financial statements, including those incorporated by reference into the Registration Statement, which it cautioned should no longer be relied on. Among other things, the Form 8-K states:

> On August 1, 2021, the Board of Directors of the Company, in consultation with the Company's management, determined that the Company's audited financial statements for the year ended December 31, 2019, included in the Company's Annual Report on Form 10-K for the year ended December 31, 2019, filed with the Securities and Exchange Commission ("SEC") on March 27, 2020, and quarterly unaudited financial statements for the quarters ended March 31, 2020, June 30, 2020, and September 30, 2020, included in the Company's Quarterly Reports on Form 10-Q filed with the SEC on May 15, 2020, August 14, 2020, and November 19, 2020, respectively, should no longer be relied upon.
>
> . . .
>
> Based on the foregoing, the Company is working to complete a restatement of, and file amended financial statements with the SEC for, the year ended December 31, 2019, and the first three quarters of 2020.
>
> . . .
>
> Management is also assessing the effect of the restatements on the Company's internal control over financial reporting and its disclosure controls and procedures.[78]

---

[78] GWG Holdings, Inc., Current Report at p. 1 (Form 8-K) (Aug. 3, 2021).

121.    In the same Form 8-K GWG announced it had "suspended the sale of its L Bonds due to the fact that the Company did not timely file its 2020 Form 10-K."[79]

### 2.    GWG Restates Its Financials

122.    On November 5, 2021, GWG filed the 2020 10-K which restated the Company's financial statements for the year ended December 31, 2019 (audited by Whitley Penn), and the quarters ended March 31, 2020, June 30, 2020, and September 30, 2020. The Restatement covered GWG's financial statements throughout the Offering Period.

### 3.    GWG Discloses It Is Under Investigation by the SEC

123.    At the same time GWG announced the Restatement on November 5, 2021, GWG disclosed for the first time that it was the subject of an SEC investigation relating in part to the L Bonds, accounting for the consolidation of Ben (the subject of the Restatement), and goodwill valuation:

> On October 6, 2020, GWG Holdings received a subpoena to produce documents from the Chicago office of the SEC's Division of Enforcement, informing the Company of the existence of a non-public, fact-finding investigation into GWG Holdings. Since the initial subpoena, the Company has received subsequent subpoenas from the SEC for additional information. **The requested information from the SEC has primarily related to GWG Holdings' investment products, including its L Bonds, as well as various accounting matters, among them, the consolidation for financial reporting purposes of Beneficient by GWG Holdings, goodwill valuation, and the accounting related to the ExAlt Trusts, related party transactions, life insurance policies, and the calculation of the debt-coverage ratio.** . . . Regardless of the outcome, the SEC investigation may have an adverse impact on us because of fines, legal costs, other expenses, diversion of management resources, and other factors. The investigation could also result in reputational harm to the Company and may have a material adverse effect on the Company's current and future business activities and its ability to raise capital through the sale of L Bonds and equity securities. As a result, the failure to raise enough capital to meet our cash needs could have a material adverse effect on our operations and the value of our securities.[80]

---

[79] *Id.*

[80] GWG Holdings, Inc., Annual Report at pp. 37-38 (Form 10-K) (Nov. 5., 2021) (emphasis added).

### 4.    Ben Spins Off from GWG, and GWG Issues a "Going Concern" Warning and Invokes Bankruptcy Protection

124.    On August 25, 2021, GWG announced a plan whereby Ben would spin off from GWG.[81] Effective November 29, 2021, Ben ceased to be a GWG subsidiary.[82]

125.    GWG's 2020 10-K included a "Going Concern" warning, disclosing the existence of "substantial doubt regarding [its] ability to continue as a going concern." [83]

126.    On January 18, 2022, GWG filed a Current Report on Form 8-K announcing that it had authorized management to engage a restructuring advisor, it had failed to make interest and principal payments on L Bonds, a potential event of default under the trust indenture for the L Bonds, and the Company had suspended its L Bond sales (GWG had attempted without success to resume L Bond sales after filing its 2020 10-K).[84]

127.    On April 20, 2022, GWG filed a Current Report on Form 8-K disclosing that GWG and certain of its subsidiaries had filed a voluntary petition for reorganization under chapter 11 of title 11 of the U.S. Code in the Bankruptcy Court for the Southern District of Texas.[85]

128.    At the time GWG sought bankruptcy protection, the aggregate principal amount of outstanding L Bonds exceeded $1.6 billion.

## V.    THESE INVESTOR CLAIMS ARE TIMELY

129.    Plaintiffs' claims are timely because they filed this action within one year of the dates on which a reasonably diligent plaintiff would have discovered the facts constituting the violations alleged in this complaint.

---

[81] GWG Holdings, Inc., Current Report (Form 8-K) (Aug. 25, 2021).

[82] GWG Holdings, Inc., Current Report (Form 8-K) (Dec. 3, 2021).

[83] GWG Holdings, Inc., Annual Report at p. 12 (Form 10-K) (Nov. 5., 2021)

[84] GWG Holdings, Inc., Current Report at p. 1 (Form 8-K) (Jan. 18, 2022).

[85] GWG Holdings, Inc., Current Report at p. 1 (Form 8-K) (Apr. 20, 2022).

130.    To the extent the claims against the Individual Defendants and Whitley Penn relate to facts disclosed in the Restatement, Plaintiffs exercising reasonable diligence could not have discovered Defendants' alleged violations any earlier than November 5, 2021, the date GWG belatedly released its 2020 10-K, which includes the Restatement. With respect to all other facts giving rise to the claims, Plaintiffs could not have discovered Defendants' alleged violations any earlier than February 1, 2023, when the OBC Complaint was unsealed.

131.    Plaintiffs filed a related complaint in this Court on February 18, 2022.

132.    Plaintiffs and Defendant Ben and the Individual Defendants agreed to toll the statute of limitations as to the claims asserted against them in this Complaint, effective April 28, 2022, and continuing through May 25, 2023.

133.    Plaintiffs and Defendant Whitley Penn agreed to toll the statute of limitation as to the claims asserted against it herein, effective October 5, 2022, and continuing through May 26, 2023.

134.    In consequence of the foregoing, all claims asserted in this complaint are timely.

## VI.    **CLASS ALLEGATIONS**

135.    Plaintiffs bring this action under Rule 23 on behalf of a proposed class of all persons who acquired L Bonds pursuant to the Registration Statement during the Offering Period (June 3, 2020 through April 16, 2021). Excluded from this Class are Defendants and their family members, Defendants' officers, Directors and affiliates at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest. For avoidance of doubt, the Seller Trusts are excluded from the Class.

136.    The members of the Class are so numerous that joinder of all members is impracticable. According to records maintained by GWG and filings by GWG in bankruptcy court,

there are approximately 27,000 holders of L Bonds. The average investment in L Bonds is approximately $45,000. GWG sold approximately $350,000,000 worth of L Bonds pursuant to the Registration Statement. GWG also "rolled over" and "reissued" L Bonds to an unknown number of Class members pursuant to the Registration Statement. Based on GWG's $350 million in L Bond sales pursuant to the Registration Statement, and the average individual investment, Plaintiffs estimate the Class includes at least 7,000 members. The exact number of Class members can be ascertained through discovery. Class members can be identified from records maintained by GWG or verified in the GWG bankruptcy and can be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

137. Plaintiffs' claims are typical of the claims of the members of the Class, all of whom are similarly affected by Defendants' wrongful conduct in violation of federal law described herein. Plaintiffs, like all Class members, acquired L Bonds before November 5, 2021 pursuant to the Registration Statement. Because Plaintiffs' claims and the claims of Class members arise from the same course of conduct and are premised on the same legal theories, by pursuing their claims Plaintiffs will advance the interests of the Class.

138. Plaintiffs will fairly and adequately protect the interests of Class members. Plaintiffs have retained counsel competent and experienced in class and securities litigation. Plaintiffs' interests align with those of the other Class members; there are no conflicts of interest. Plaintiffs have supervised the prosecution of this action, and familiarized themselves with the facts and alleged violations at issue, by reviewing pleadings and other materials and through regular communications with counsel. Also, in the bankruptcy proceeding, Plaintiffs have served as members of the Official Bondholders' Committee since it was formed on or about May 9, 2022.

Plaintiffs are committed to overseeing the effective prosecution of this case to maximize recoveries for similarly situated L Bond holders.

139.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members. Among the questions of law and fact common to the Class are:

a.      whether Defendants violated the Securities Act;

b.      whether the Registration Statement contained inaccurate statements of material fact and omitted material information required to be stated therein concerning: (i) the financial statements included in GWG's 2019 10-K and March 2020 10-Q; (ii) the nature of Ben's business and its financial performance and value; (iii) the adequacy of GWG's internal controls over financial reporting and GAAP compliance; (iv) the use of funds raised from L Bond holders prior to the Registration Statement's effective date, including to carry out related party transactions; and (v) the motivation for the 2019 resignation of several GWG Board members; and

c.      to what extent the members of the Class have sustained damages and the proper measure of damages.

140.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, including because joinder of all members is impracticable. Moreover, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation would prevent members of the Class from individually redressing the wrongs done to them. Prosecuting the claims pleaded herein in a class action will eliminate the possibility of repetitive litigation. There will be no material difficulty in the management of this action as a class action.

## COUNT I
### Violation of § 11 of the Securities Act
### Against the Individual Defendants

141.    Plaintiffs repeat and reallege each and every allegation set forth above.

142.    This Count is brought pursuant to § 11 of the Securities Act of 1933, 15 U.S.C. § 77k, on behalf of the Class against the Individual Defendants.

143.    This Count alleges and sounds in strict liability.

144.    As set forth above, the Registration Statement is materially inaccurate and misleading, contains untrue and incomplete statements of material facts, omits to state other facts necessary to make the statements made not misleading, and omits to state material facts required to be stated therein.

145.    The Registration Statement incorporated by reference the 2019 10-K and the March 2020 10-Q, both of which were restated in the late-filed 2020 10-K. In issuing the Restatement, GWG advised that its 2019 10-K and March 2020 10-Q should no longer be relied upon.

146.    Defendants also made material misstatements and omissions by failing to disclose in the Registration Statement that: (1) GWG's financial statements were not prepared in accordance with GAAP; (2) GWG lacked adequate internal and financial controls; (3) GWG's valuation of Ben was materially overstated; (4) GWG materially misrepresented the nature of Ben's business and its true financial condition; (5) GWG's representations about the use of proceeds to repay Ben indebtedness were materially incomplete, misleading, and concealed related party transactions; and (6) GWG's representations about the reasons for the resignation of several GWG directors before the effective date of the Registration Statement were materially misleading and false.

147.    The Individual Defendants each signed or were named as Directors in the Registration Statement. As such, each is strictly liable for the material misrepresentations and

omissions in the Registration Statement and the failure of the Registration Statement to be complete and accurate. Each Individual Defendant had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements in the Registration Statement and ensure that the representations in the Registration Statement were true and accurate, that there were no omissions of material facts that would render the Registration Statement misleading, and that the Registration Statement contained all facts required to be stated therein. In the exercise of reasonable care, the Individual Defendants should have known of the material misrepresentations and omissions in the Registration Statement and should have known of the omissions of material facts necessary to make the statements made therein not misleading or otherwise required to be stated therein. Accordingly, the Individual Defendants are liable to Plaintiffs and the Class under Section 11 for the material misrepresentations and omissions in the Registration Statement, and the failure of the Registration Statement to be complete and accurate.

148.    None of the Defendants made a reasonable investigation or had reasonable grounds for the belief that the statements in the Registration Statement were true, free of omissions of material facts, and not misleading.

149.    By reason of the conduct herein alleged, each Defendant violated, and/or controlled a person who violated, § 11 of the Securities Act.

150.    Plaintiffs acquired L Bonds pursuant to the Registration Statement.

151.    Plaintiffs and the Class have sustained damages. The value of L Bonds issued in the Offering has declined substantially subsequent to and due to Defendants' violations.

152.    By reason of the foregoing, Plaintiffs and Class members are entitled to damages under § 11, as measured by the provisions of § 11(e), as well as any and all remedies that may exist at law or in equity.

## COUNT II
### Violation of § 11 of the Securities Act
### Against Whitley Penn

153.    Plaintiffs repeat and reallege each and every allegation set forth above.

154.    This Count is brought pursuant to § 11 of the Securities Act of 1933, 15 U.S.C. §
77k, on behalf of the Class against Whitley Penn.

155.    This Count alleges and sounds in strict liability.

156.    As set forth above, the Registration Statement is materially inaccurate and
misleading, contains untrue statements of material facts, omits to state other facts necessary to
make the statements made not misleading, and omits to state material facts required to be stated
therein.

157.    The Registration Statement incorporated by reference the 2019 10-K which was
restated in the belatedly filed 2020 10-K. Whitley Penn audited the financial statements included
in the 2019 10-K that were subject to the Restatement. The 2019 10-K includes Whitley Penn's
opinions that: (1) "the consolidated financial statements present fairly, in all material respects, the
financial position of the Company as of December 31, 2019, and the results of their operations and
their cash flows for the year ended December 31, 2019"; and (2) "the Company maintained, in all
material respects, effective internal control over financial reporting as of December 31, 2019."[86]
Whitley Penn consented to the incorporation by reference of those opinions into the Registration
Statement. In connection with the Restatement GWG advised that its 2019 10-K should no longer
be relied upon.

---

[86] GWG Holdings, Inc., Annual Report at pp. F-1-F-2 (Form 10-K) (Mar. 27, 2020).

158.    Whitley Penn also made material misstatements and omissions by failing to disclose that: (1) GWG's financial statements were not prepared in accordance with GAAP; and (2) GWG lacked adequate internal and financial controls.

159.    Whitley Penn did not conduct a reasonable investigation or have reasonable grounds to believe that statements in the Registration Statement were true, free of omissions of material facts, and not materially misleading.

160.    By reason of the conduct herein alleged, Whitley Penn violated § 11 of the Securities Act.

161.    Plaintiffs acquired L Bonds pursuant to the Offering.

162.    Plaintiffs and the Class have sustained damages. The value of L Bonds issued in the Offering has declined substantially subsequent to and due to Defendants' violations.

163.    By reason of the foregoing, Plaintiffs and Class members are entitled to damages under § 11, as measured by the provisions of § 11(e), as well as any and all remedies that may exist at law or in equity.

**COUNT III**
**Violation of § 12(a)(2) of the Securities Act**
**Against the Individual Defendants**

164.    Plaintiffs repeat and reallege each and every allegation set forth above.

165.    This Count is brought pursuant to § 12(a)(2) of the Securities Act of 1933, 15 U.S.C. § 77l(a)(2), on behalf of the Class against the Individual Defendants.

166.    This Count alleges and sounds in strict liability.

167.    By means of the Prospectus, Defendants promoted, solicited, and sold L Bonds to Plaintiffs and Class members. Defendants were sellers to and direct solicitors of purchases of L Bonds offered pursuant to the Offering. Defendants issued, caused to be issued, or signed or

authorized the signing of the Prospectus in connection with the Offering, and used it to directly induce investors, including Plaintiffs and other Class members, to purchase the L Bonds.

168.    The Prospectus contained untrue statements of material fact and concealed and failed to disclose material facts, as detailed above. Defendants' acts of solicitation included participating in the preparation, dissemination, and promotion of the false and misleading prospectus directly to Plaintiffs and Class members.

169.    Defendants owed Plaintiffs and Class members the duty to make a reasonable and diligent investigation of the statements in the prospectus to ensure that such statements were accurate and did not contain any misstatement or omission of material fact required to be stated in order to make the statements therein not misleading. The Individual Defendants, in the exercise of reasonable care, knew or should have known that the Prospectus contained misstatements and omissions of material fact.

170.    Plaintiffs did not know—nor, in the exercise of reasonable diligence, could they have known—of the material falsehoods and omissions in the Prospectus at the time Plaintiffs acquired L Bonds.

171.    By reason of the conduct alleged herein, Defendants violated § 12(a)(2) of the Securities Act. As a result of such violations, Plaintiffs and Class members received L Bonds pursuant to the Prospectus and sustained substantial damages in connection with their purchases of the bonds. Accordingly, Plaintiffs and the other members of the Class who hold L Bonds issued pursuant to the Registration Statement, have the right to rescind and recover the consideration paid for their bonds, and hereby tender their L Bonds to Defendants. Class members who have sold their L Bonds seek damages, disgorgement, and additional remedies to the extent permitted in equity or at law.

**COUNT IV**
**Violation of § 15 of the Securities Act**
**Against Ben and the Individual Defendants**

172.     Plaintiffs repeat and reallege each and every allegation set forth above.

173.     This Count is brought pursuant to § 15 of the Securities Act of 1933, 15 U.S.C. § 77o, on behalf of the Class against Ben and the Individual Defendants.

174.     This Count alleges and sounds in strict liability.

175.     The Individual Defendants were controlling persons of GWG by virtue of their positions as Directors or senior officers of GWG. The Individual Defendants each had a series of direct or indirect business or personal relationships with other Directors or officers or major shareholders of GWG. At all relevant times, the Individual Defendants participated in the operation and management of GWG, and conducted and participated, directly and indirectly, in the conduct of GWG's business affairs.

176.     Ben was a control person of GWG by virtue of its direct power to designate the members of GWG's Board. Following the April 2019 transaction in which GWG's founders sold and transferred their shares and resigned their positions at GWG and from its Board, and in which a stockholders' agreement, previously limiting the Seller Trusts' voting rights, was terminated, the Seller Trusts—which owned approximately 79% of GWG's common shares—became controlling stockholders of GWG and conferred upon Ben the power to designate the members of GWG's Board.

177.     Ben exercised its direct control over GWG by designating the members of its Board, including Heppner (who became Chairman) and Individual Defendants Cangany, Hicks, Lockhart, and Schnitzer. Under the control of these Directors, the Board appointed Holland as GWG's CEO. Within the scope of their positions as Directors of GWG, each of the Individual

Defendants, directly or indirectly, controlled the statements made in, signed, or agreed to be named in the Registration Statement.

178.    By reason of the aforementioned conduct, the Individual Defendants and Ben were culpable participants in the violations of §§ 11 and 12(a)(2) of the Securities Act set forth above, and thus are also liable pursuant to § 15 of the Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.    Certifying this action under Rule 23 for trial as a class action and affirming the appointment of Plaintiffs as Lead Plaintiffs and Plaintiffs' counsel as Lead Plaintiffs' Counsel;

B.    Awarding damages in favor of Plaintiffs and the Class against all Defendants, jointly and severally, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including reasonable counsel fees and expert fees; and

D.    Awarding rescission, disgorgement, or such equitable, injunctive or other relief as deemed appropriate by the Court.


Dated: May 26, 2023

**BURNS CHAREST LLP**

*/s/ Spencer Cox*

Warren T. Burns (TXBN 24053119)
Spencer Cox (TXBN 24097540)
900 Jackson Street, Suite 500
Dallas, TX 75202
Tel: (469) 904-4550
Fax: (469) 444-5002
wburns@burnscharest.com
scox@burnscharest.com

Daniel C. Girard (*pro hac vice* application forthcoming)

Jordan Elias (*pro hac vice* application forthcoming)
Adam Polk (*pro hac vice* application forthcoming)
Sean Greene (*pro hac vice* application forthcoming)
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Tel: (415) 981-4800
dgirard@girardsharp.com
jelias@girardsharp.com
apolk@girardsharp.com
sgreene@girardsharp.com

Paul D. Malmfeldt (*pro hac vice* application forthcoming)
**MALMFELDT LAW GROUP P.C.**
120 N. LaSalle Street, Suite 2000
Chicago, IL 60602
Tel: (312) 606-8625
pdm@malmfeldt.com

*Attorneys for Plaintiffs Thomas Horton and Frank Moore*

CERTIFICATION OF THOMAS HORTON
PURSUANT TO THE FEDERAL SECURITIES LAWS

THOMAS HORTON declares:

1.      I have reviewed the complaint in this action, and agree with and support its allegations.

2.      I did not purchase the securities at issue in this action at the direction of plaintiffs' counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.      I am willing to serve as a representative party on behalf of the proposed class, including providing testimony at deposition and trial, if necessary.

4.      Schedule A, attached to this Certification, accurately shows my transactions during the Class Period in the securities that are the subject of this action.

5.      I have neither served nor sought to serve as a representative party in a class action under the federal securities laws within the three-year period prior to the date of this Certification, except in the following related class action:

- *Bayati v. GWG Holdings, Inc., et al.*, No. 3:22-cv-00410-B (N.D. Tex., filed Feb. 18, 2022).

6.      I will not accept any payment for serving as a representative party on behalf of the proposed class beyond my *pro rata* share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 22nd day of May 2023.



Thomas Horton

# SCHEDULE A

## SECURITIES TRANSACTIONS

| L Bonds | |
| --- | --- |
| **Date Acquired** | **Principal Amount of Bonds Acquired** |
| 7/22/2020 | $2,500,000.00 |
| 7/22/2020 | $2,500,000.00 |
| 7/22/2020 | $600,000.00 |
| **Total** | $5,600,000.00 |

## CERTIFICATION OF FRANK MOORE
## PURSUANT TO THE FEDERAL SECURITIES LAWS

FRANK MOORE declares:

1.      I have reviewed the complaint in this action, and agree with and support its allegations.

2.      I did not purchase the securities at issue in this action at the direction of plaintiffs' counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.      I am willing to serve as a representative party on behalf of the proposed class, including providing testimony at deposition and trial, if necessary.

4.      Schedule A, attached to this Certification, accurately shows my transactions during the Class Period in the securities that are the subject of this action.

5.      I have neither served nor sought to serve as a representative party in a class action under the federal securities laws within the three-year period prior to the date of this Certification, except in the following related class action:

- *Bayati v. GWG Holdings, Inc., et al.*, No. 3:22-cv-00410-B (N.D. Tex., filed Feb. 18, 2022).

6.      I will not accept any payment for serving as a representative party on behalf of the proposed class beyond my *pro rata* share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 22nd day of May 2023.

DocuSigned by:

*Frank Moore*

469A6E3BC0DC45F...

Frank Moore

## SCHEDULE A

## SECURITIES TRANSACTIONS

| L Bonds | |
|---|---|
| **Date Acquired** | **Principal Amount of Bonds Acquired** |
| 9/1/2020 | $225,000.00 |
| 1/1/2021 | $33,000.00 |
| 1/1/2021 | $25,000.00 |
| **Total** | $283,000.00 |